**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MIKAL JOHNSON, ) | CASE NO. 5:16-cv-02762 |
| ) | |
| Petitioner, ) | JUDGE CHRISTOPHER A. BOYKO |
| ) | |
| v. ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| ) | |
| CHARMAINE BRACY, Warden, ) | |
| ) | **REPORT AND RECOMMENDATION** |
| Respondent. ) | |

Petitioner, Mikal Johnson (hereinafter "Petitioner" or "Johnson"), challenges the constitutionality of his conviction in the case of *State v. Johnson*, Stark County Court of Common Pleas Case No. 2013-CR-55. Petitioner, *pro se*, filed his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on November 14, 2016. (R. 1). On March 17, 2017, Warden Charmaine Bracy ("Respondent") filed her Answer/Return of Writ. (R. 7). Petitioner filed a Traverse on August 15, 2017 (R. 12), to which Respondent filed a reply. (R. 14). This matter is before the undersigned Magistrate Judge pursuant to Local Rule 72.2. For reasons set forth in detail below, it is recommended that the habeas petition be DISMISSED as procedurally defaulted.

## I. Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012) ("State-court factual findings are presumed correct unless rebutted by clear and convincing evidence.") The Fifth District Court of Appeals (hereinafter "state appellate court") summarized the facts underlying Petitioner's conviction as follows:

> {¶ 2} The charges in the case at bar arose from the home invasion aggravated burglary of Kim Eller on November 22, 2013, the home invasion aggravated burglary of Eugene Render on November 18, 2013, and the subsequent home invasion robbery and killing of Eugene Render on November 22, 2013. Johnson waived his right to a jury trial and the case went to trial before a three-judge panel selected pursuant to R.C. 2945.06.
>
> ***NOVEMBER 18, 2013—CANTON***
>
> {¶ 3} David Render testified that Eugene Render was his father. David Render *108 stated that his father called him on November 18, 2013 to let him know that someone had tried to break in to his residence. The Canton police were called and Officer Michael Roberts responded and learned from Mr. Render that he heard a loud crash and someone kicking in his door. He yelled out and the intruders ran away.
>
> {¶ 4} Roberts looked around the home and looked at the door. The doorframe had been splintered and pieces were lying on the floor. He made a police report.
>
> {¶ 5} David Render stated that he did see damage to his father's home where the breezeway door was broken. David Render wanted his father to come stay with him. However, Mr. Render refused instead boarding up his door with two by fours.
>
> ***NOVEMBER 22, 2013—NAVARRE***
>
> {¶ 6} John Burns testified that his address was 266 Bender St. NE., Navarre, Ohio Lot Number 8. Burns testified that he was home the morning of November 22, 2013 when he observed a white vehicle that contained two black men. Burns testified that he saw the two black men walking around the trailer park and then

saw them later run past his house.

{¶ 7} Kim Eller testified that she lives at 266 Bender St. NE. Lot Number 5, Navarre, Ohio. On November 22, 2013, two black men entered her trailer. Eller stated that one man held a gun to her and the other took her computer. Eller stated that of the two individuals that entered her home it was the short one that held the gun to her head while the taller skinnier individual went through the home.

{¶ 8} Sgt. Chris Hummel of the Navarre Police Department testified that he was on duty November 22, 2013 and he responded to a burglary call at 266 Bender Street. Sgt. Hummel testified that he observed the door had been broken in for that residence. However, Sergeant Hummel stated that his recollection of his report was that Eller told him that the skinnier individual held the gun to her head.

{¶ 9} Deanna Fisk testified that she was the girlfriend of Japheth Thomas and was familiar with Johnson. Fisk testified that on November 22, 2013 she went with Thomas, Johnson and an unknown white male to a trailer park in Navarre to "hit a lick." Fisk remembered seeing a BB gun and a pistol in the car while they were on their way to the trailer park. Fisk stated that once they arrived Thomas and Johnson got out of the vehicle with the BB gun and the pistol and within five minutes returned with a broken down laptop.

*NOVEMBER 22, 2013—CANTON*

{¶ 10} David Render testified that he and his wife went to his father's residence on November 22, 2013 after his father had repeatedly not answered phone calls. Upon arriving, he observed the outside door was busted up, glass was knocked out of the screen door, and a door handle was bent. David Render then went into his father's residence where he found a camouflage gun laying on the floor and then ultimately found his father dead on the floor. David Render also observed a Glock on the kitchen table that had its slide closed and the clip was still in it.

{¶ 11} Three Canton City police patrol cars were dispatched to the home of Mr. Render on Montrose Avenue; Officer Joseph Bays was one of them. Bays went into the house and saw a rifle lying on the breezeway floor, a 9–millimeter Glock pistol on the kitchen table and a body lying on the kitchen floor. One of the medics had cleared the Glock. Officer Bays was \*109 instructed by Sgt. George to stand by a hat or a bandanna that was found north of the residence until someone came to collect it.

{¶ 12} Detective Victor George and agents from the Bureau of Criminal Investigation were called. There was definite evidence that Mr. Render as well as the home invaders fired a weapon.

{¶ 13} The body of Mr. Render was removed by the medics and taken to the

3

hospital. He was pronounced dead at 6:55 pm. Dr. P.S.S. Murthy, the Stark County Coroner, performed an autopsy the next day. In an external examination, Murthy noted two gunshot wounds; one in the right chest and one in the right lower quadrant of his abdomen. The gunshot wound to the chest had an oval appearance and entered the body at a right angle. It perforated the lower lobe of the right lung causing an accumulation of blood and was fatal.

{¶ 14} The gunshot wound to the abdomen had a different appearance; it scraped the body before it entered. It appeared that Mr. Render was in a crouched position when that bullet entered his body. It entered the right lobe of the liver causing massive damage; it pulpified the liver and was fatal. Dr. Murthy found no stippling or soot meaning that the gun was not shot at close range.

{¶ 15} Dr. Murthy extracted two large caliber hollow point bullets from Mr. Render's body. They were turned over to Larry Hootman, a crime scene agent with the Attorney General's Bureau of Criminal Investigation.

{¶ 16} Michael Roberts, a firearms expert with BCI examined the bullet recovered from the body of Mr. Render and the cartridges from the scene. Roberts determined they were Remington brand .40–caliber hollow point bullets meant to cause more damage than full metal jacket bullets. They were all fired from the same firearm. The firearm was not recovered at the scene. However, Roberts opined that they were fired from an operable Smith and Wesson Sigma Series pistol.

{¶ 17} Jennifer LaCava, a forensic scientist with BCI, tested the blue bandana and hat recovered outside at the scene for DNA. Johnson's DNA was not conclusively found on either of the items. However, the DNA of Japheth Thomas (JT), Johnson's codefendant, was found on the hat and the bandana.

{¶ 18} The blood found on the door of Mr. Render's home was also tested for DNA. It was consistent with the blood of Japheth Thomas.

***JAPHETH THOMAS (JT) IS SHOT AND GOES TO TIMKEN MERCY***
{¶ 19} On Friday, November 22, 2013 about 9:00 pm, then Detective Robert Redleski responded to a "shooting casualty" call from Timken Mercy Medical Center. There, Redleski met Japheth Thomas (JT). JT told him he was shot in the left arm at Chips Apartments and gave him two names and phone numbers who could verify the account. Redleski went back to the police station to follow up and learned that JT was a suspect in the theft of a white Nissan crossover.

{¶ 20} Detective George was alerted to the "shooting casualty" of JT and knew that Mr. Render had fired some shots. He went out looking for JT and the United States Marshal's Task Force (Task Force) found him driving the stolen Nissan on Monday, November 25, 2013 with another male in the car. JT was arrested. A

4

laptop computer was found in the Nissan. The laptop computer found in the white Nissan when JT was arrested was identified by Eller as the stolen computer.

{¶ 21} The police returned to JT's residence where they conducted a search and brought several persons down to police headquarters for interviews.

{¶ 22} The interviews conducted by George led to an additional suspect in the killing of Mr. Render—the appellant, Mikal Johnson.

*JOHNSON CONFESSES TO THE KILLING AND OTHER BURGLARIES AND ROBBERY*

{¶ 23} Johnson was picked up by the Task Force and brought to the Police Department for questioning. Johnson confessed to the burglary and robbery of Mr. Render. He also confessed to an aggravated robbery that occurred in the morning of November 22, 2013 in Navarre, Ohio. He also confessed to the break-in at the Render home on November 18, 2013.

{¶ 24} The interview was played for the three-judge panel. Johnson first denied that he participated in the home invasion at the Render house on November 22, 2014. However, after some prompting by Detective George, he admitted to his involvement, told George how the door was broken, how JT was shot and what occurred after the crimes. However, Johnson denied he was the shooter. He did not say JT did the shooting; only that he was not the shooter. He also identified Deanna Fisk and Derrick Wilson as persons he saw the day of the killing at JT's home.

*JOHNSON TELLS WITNESSES, "I KILLED SOMEBODY." "I THINK I KILLED HIM."*

{¶ 25} Deanna Fisk, age 15, was the girlfriend of JT and staying at his house in November 2013. She often hung out with JT and Johnson. Indeed, she went with them to "hit a lick" in Navarre on November 22, 2013 in the stolen white Nissan. A laptop computer was stolen. After the Navarre burglary, they all returned to the home of JT and were "chilling."

{¶ 26} Fisk heard JT and Johnson discussing hitting another lick. They talked about getting guns including a "sniper." The pair left and Fisk remained at the home.

{¶ 27} That evening, Johnson and JT returned to the home running. Johnson was first; JT followed. JT showed her his arm where he was shot. Johnson was upset. Fisk testified,

> A. Um, Mikal came running through the back door saying he killed somebody, and I asked him where's JT at, where's JT at, and JT runs in like

> two, I don't know, a couple minutes back behind him and JT was shot.
>
> Q. Okay.
>
> So after they leave at some point you say Mikal [Johnson] comes running in?
>
> A. Um-hum.
>
> Q. And he says what?
>
> A. That he killed somebody.
>
> Q. Okay.
>
> Was he—did he appear to be upset?
>
> A. Yeah, he was running back and forth real fast taking off his gloves and his hat and his shoes and stuff saying he killed somebody.

3T. at 18.

{¶ 28} Derrick Wilson was at JT's home that evening. It was a Friday and on Fridays he had no school and liked to party, drinking and smoking weed. He saw Johnson and JT leave around 6:00 to hit a lick. Wilson thought they would return with a couple of "flat screens and a gun or something."

{¶ 29} JT and Johnson returned between 7:00 p.m. and 11:00 p.m. Johnson came in first and was frantic. He had a silver and black handgun. "He was saying I think I killed him." Johnson left and *111 Wilson went with Fisk and JT in the white Nissan to the hospital.

{¶ 30} Christopher Knight saw JT and Johnson on November 22, 2013. He was a friend of Fisk, JT's girlfriend. They came to his home early that day to borrow some money. Toward evening, JT and Fisk returned. JT was carrying a black bag and Knight believed there was a pistol in it.

{¶ 31} Later that day, Knight learned that JT had been shot. He saw JT again after he returned from the hospital. He had a bandage on his arm. JT told Knight what happened. Knight testified,

> Yes. In his own—he said basically what—they went to do this and they kicked in a door and the old man, his words, was—started blasting at him and that his friend returned fire—

4T. at 89.

6

{¶ 32} When Detective George interviewed Johnson, he admitted to the home invasion at the Render home on Monday, November 18 and claimed to use BB guns:

> GEORGE: ... That house you were both at earlier in the week? Do you remember that.
>
> JOHNSON: Yes.
>
> GEORGE: And you kicked that door in because it was locked or whatever and the old guy woke up and come out. You heard him, and what did the both of you do"
>
> JOHNSON: I ran.
>
> GEORGE: Both of you did?
>
> JOHNSON: Yes.
>
> GEORGE: But then you decided to go back on Friday, right?
>
> JOHNSON: Yeah

State's Exhibit 2.

{¶ 33} Upon cross-examination Detective George admitted that he asked Johnson 20 to 30 times to confess to being a shooter of Eugene Render; however, Johnson denied it every single time. Detective George also stated there was no physical evidence tying Johnson to being a shooter in this case. Detective George acknowledged that there were conflicting reports on whether or not Johnson was the individual who shot Eugene Render. Detective George admitted that he decided Johnson was the shooter based upon the fact that more people said Johnson was the shooter.

*State v. Johnson*, 2015-Ohio-3113, ¶¶ 2-33, 41 N.E.3d 104, 107-11 (Ohio Ct. App. 2015).

## II. Procedural History

A. **Conviction**

On January 28, 2014, a Stark County Grand Jury charged Johnson with one count of

aggravated murder[1] with death penalty and firearm specifications in violation of Ohio Revised Code ("O.R.C.") § 2903.01(B), one count of aggravated robbery in violation of O.R.C. § 2911.01(A), and three counts of aggravated burglary in violation of O.R.C. § 2911.11(A). (R. 7-1, PageID# 65-69, Exh. 1). Several of the counts also carried firearm specifications. *Id*.

Petitioner plead not guilty and was found guilty as charged by a three-judge panel.[2] (R. 7-1, PageID# 78-82, Exh. 6).

After the court held the penalty phase, it concluded that Johnson should not receive a death sentence, but rather life in prison without parole for aggravated murder (Count 1). (R. 7-1, PageID# 83, Exh. 7). Johnson also received three years on the mandatory firearm specification to be served consecutive to the life sentence. (R. 7-1, PageID# 84-85, Exh. 8). The court determined that the aggravated robbery offense and one of the aggravated burglaries were allied offenses that would merge into Count 1. (R. 7-1, PageID# 86, Exh. 8). He was sentenced to eleven years each for the other two aggravated burglary convictions to be served consecutively resulting in an aggregate sentence of life in prison without parole plus 25 additional years. *Id.*

**B.    Direct Appeal**

On October 22, 2014, Petitioner, through counsel, filed a Notice of Appeal with the state appellate court. (R. 7-1, PageID# 89, Exh. 9). Petitioner raised the following assignments of error:

1.   Appellant's convictions were against the manifest weight and sufficiency of the evidence.

2.   Appellant's Sixth Amendment right to confront witnesses against him was

---

[1] Subsequently, count one was amended to include "aider and abettor language" under O.R.C. 2923.03(A)(2). (R. 7-1, PageID# 71-75, Exhs. 3 & 4).

[2] Petitioner waived his right to a trial by jury. (R. 7-1, PageID# 76, Exh. 5).

8

> violated when the trial court permitted the admission of hearsay statements.
>
> 3. The trial court abused its discretion by ordering appellant to serve maximum consecutive sentences.

(R. 7-1, PageID# 90-115, Exh. 10).

On August 3, 2015, the state appellate court affirmed Petitioner's conviction and sentence, except for the aggravated burglary conviction related to the events on November 18, 2013.[3] (R. 7-1, PageID# 172-206, Exh. 12).

On July 5, 2016, nearly a year after the state appellate court's decision, Johnson, *pro se*, filed a Notice of Appeal with the Supreme Court of Ohio. (R. 7-1, PageID# 211, Exh. 16). Concomitantly, Johnson filed a motion for leave to file a delayed appeal.[4] (R. 7-1, PageID# 211, Exh. 16).

On August 31, 2016, the Supreme Court of Ohio denied Johnson's motion for delayed appeal. (R. 7-1, PageID# 254, Exh. 18).

**C. Federal Habeas Petition**

On November 14, 2016, Johnson filed a Petition for Writ of Habeas Corpus asserting the following grounds for relief:

**GROUND ONE**: Evidence was constitutionally insufficient to sustain a

---

[3] The court concluded that there was insufficient evidence to establish the requisite element of use of a "deadly weapon." *Johnson*, 41 N.E.3d at 114. The court noted that its decision "in no way affects the guilty verdicts and sentences issued by the three-judge panel on any other count of the indictment." *Id*. at 123. Upon, remand and pursuant to the state appellate court's decision, on August 24, 2015, the State moved the court to dismiss the aggravated burglary conviction in Count 5. (R. 7-1, PageID# 208-209, Exh. 14). The same day, the trial court dismissed Count 5 of the indictment and indicated that all other sentences remained unchanged. (R. 7-1, PageID# 210, Exh. 15).

[4] In his motion, Johnson conceded that his attorney provided him a copy of the state appellate court's decision, but alleges that copy was incomplete and that he had to request a copy from the clerk of courts at a cost of $3.60. (R. 7-1, PageID# 213-217, Exh. 17).

9

>
> conviction.
>
> *Supporting Facts*: The testimony of Kim Eller and Sergeant Hummel was uncertain as to who had the gun and used it and the testimony of Deanna Fisk was biased and not credible.
>
> **GROUND TWO**: Inadmissible hearsay was admitted into trial violating 6th Amendment Confrontation Clause Rights.
>
> *Supporting Facts*: Detective Victor George testified that he received information from Robert Cassidy that connected appellant to the death of Bennie Angelo.
>
> **GROUND THREE**: Disproportionate Sentence (maximum consecutive) in violate [sic] of the 8th Amendment (cruel + unusual punishment).
>
> *Supporting Facts*: Defendant was given maximum consecutive sentences including life w/o parole despite being a first time offender and only 18 years of age.

(R. 1).

### III. Exhaustion and Procedural Default

**A. Exhaustion Standard**

State prisoners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings. *See* 28 U.S.C. § 2254(b), (c). This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). However, if relief is no longer available in state court, exhaustion can be rendered moot: "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts." *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see also Buell v. Mitchell*, 274 F.3d 347, 349 (6th Cir. 2001) ("a petitioner cannot circumvent the exhaustion requirement by failing to comply with state procedural rules.")

(citations omitted).

## B. Procedural Default Standard

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice. *See Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A claim may become procedurally defaulted in two ways. *Id.* First, a petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[5] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *See, e.g.*, *Engle v. Isaac*, 456 U.S. 107, 125-130 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default,

---

[5] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138-39; *accord Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).

11

however, are distinct concepts. AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28. Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review. *Id*. In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal. *Id*. Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id*.

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *ee McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003), *abrogated on other grounds as recognized in English v. Berghuis*, 529 Fed. App'x 734, 744-45 (6th Cir. Jul. 10, 2013).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error. *See Maupin*, 785 F.2d at 138-39. "Demonstrating cause requires showing that an 'objective factor external to the defense

12

impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id*. Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See, e.g., United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *Mason v. Mitchell*, 320 F.3d 604, 617 (6th Cir. 2003).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman*, 501 U.S. at 749-50. Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *accord Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D. Ohio 2007) (Katz, J.)

**C. Analysis**

Respondent asserts that all three of Petitioner's grounds for relief are procedurally defaulted, because they were not fairly presented to all levels of the Ohio courts. (R. 7, PageID# 37). Specifically, Respondent contends that the Ohio Supreme Court was prevented from addressing the issues raised in the petition on their merits when Petitioner failed to perfect a timely appeal. *Id*. Further, Respondent argues, the Ohio Supreme Court's rejection of a delayed appeal constitutes an independent and adequate state ground foreclosing federal habeas review.

*Id.* at PageID# 38. Finally, Respondent contends Petitioner has not and cannot establish cause sufficient to waive the procedural default. *Id.* at PageID# 38-39. Petitioner filed a traverse that failed to address Respondent's procedural default argument. (R. 12).

It is undisputed that Petitioner failed to file a timely appeal from the state appellate court's decision, and that the Ohio Supreme Court denied Petitioner's motion to file a delayed appeal.

> In Ohio, appellants have forty-five days from the entry of an adverse court of appeals judgment to file a notice of appeal to the Ohio Supreme Court. [Ohio S. Ct. Prac. R. 7.01(A)(1)(a)(i)]. If an appellant misses the forty-five day window, he may seek leave to file a delayed appeal. The Sixth Circuit has held that if the Ohio Supreme Court denies a motion for delayed appeal, it is an "independent and adequate" state procedural ground that bars later federal review of the merits.

*Lollis v. Warden, Ohio State Penitentiary*, No. 15-CV-703, 2016 WL 3619360, at *2 (N.D. Ohio July 6, 2016) (Gwin, J.), *certificate of appealability denied sub nom. Lollis v. Erdos*, No. 16-3923, 2017 WL 3613599 (6th Cir. May 3, 2017)) (*citing Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) ("This case turns upon whether the Ohio Supreme Court entry denying Bonilla's motion for leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review of Bonilla's habeas corpus petition. Upon examination of the Ohio Supreme Court Rules, we conclude that it does."); *see also Rhodes v. Warden, Ross Corr. Inst.*, No. 2:16-cv-0074, 2017 WL 2694680 (S.D. Ohio, Jun. 20, 2017) (finding that the petition was procedurally defaulted because "[t]he Ohio Supreme Court denied Petitioner's subsequent motion for a delayed appeal, and Petitioner can now no longer properly present claims one through three to the state courts by operation of Ohio's doctrine of *res judicata*"); *accord Madison v. Bradley*, No. 2:17-CV-1023, 2017 WL 5904605 (S.D. Ohio Nov. 20, 2017) (recommending dismissal because Petitioner procedurally defaulted his claims where he "failed to file a timely appeal of

the appellate court's decision denying his claims to the Ohio Supreme Court, and the Ohio Supreme Court denied his motion for a delayed appeal")

Therefore, Petitioner has procedurally defaulted his habeas claims under the *Maupin* test established by the Sixth Circuit, as (1) Petitioner failed to comply with an applicable state procedural rule – the 45 day filing deadline; (2) the Supreme Court of Ohio actually enforced the state procedural sanction by denying the delayed appeal; and, (3) the state procedural bar constitutes an "independent and adequate" state ground foreclosing federal habeas review based on Sixth Circuit precedent. 785 F.2d at 135. The only issue remaining is whether Petitioner can demonstrate both "cause" and "prejudice" excusing the default.

As noted above, Petitioner's traverse failed to set forth any cause for his default. (R. 12). In support of his motion for delayed appeal, petitioner conceded that his attorney had provided him a copy of the state appellate court's decision, but alleged that the copy provided was missing some pages and that he had to request a copy from the clerk of courts. (R. 7-1, PageID# 213-217, Exh. 17). Petitioner further emphasized that he was proceeding *pro se* and ignorant of the law. *Id*.

As explained above, in order to establish cause, a petitioner must show that "some objective factor external to the defense" impeded the defendant's efforts to comply with the State's procedural rule." *Carrier*, 477 U.S. at 488. A petitioner's ignorance of the law or the appropriate state court procedures do not constitute cause. *See Bonilla*, 370 F.3d at 498 (*citing Hannah v. Conley,* 49 F.3d 1193, 1197 (6th Cir. 1995)). Thus, Johnson's emphasis on his *pro se* status is insufficient to constitute cause. Further, his unsubstantiated and self-serving affidavit that he received an incomplete copy of the state appellate court's decision is also insufficient. Assuming his statement is accurate, Petitioner's affidavit before the Ohio Supreme Court did not

15

specify when he set about attempting to obtain a complete copy of the state appellate court's decision, when he actually obtained that copy, and why it took him almost a year to finally file his motion for delayed appeal.[6]

Lastly, while a procedural default may be excused based on a credible claim of actual factual innocence based on new, reliable evidence, Petitioner has not raised such an argument. Thus, the court concludes the petition is procedurally defaulted and no cause exists to set aside the default.[7]

### IV. Conclusion

For the foregoing reasons, it is recommended that Johnson's Petition be DISMISSED as procedurally defaulted.

/s/ David A. Ruiz
U.S. MAGISTRATE JUDGE

Date: October 17, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.** *See United States v. Walters*, **638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn*, **474 U.S. 140 (1985),** *reh'g denied*, **474 U.S. 1111 (1986).**

---

[6] If Petitioner did not set about obtaining a complete copy of the state appellate court's decision until *after* the 45-day deadline expired, he could not in good faith argue that it was the incompleteness of the decision that prevented his timely filing. Further, it bears noting that Johnson took no additional measures such as filing a timely notice of appeal along with a motion seeking an extension of time to file his supporting memorandum in support of jurisdiction.

[7] Given the lack of ambiguity over Petitioner's procedural default, the court has not addressed the underlying merits of the petition in the interests of judicial economy.